***MARTELLE & ASSOCIATES, P.A.***
Martin J. Martelle
Luke R. Gordon
ISB No. 3304
ISB No. 10681
5995 W. State St. Ste A
Boise, ID 83703
Telephone: (208) 938-8500
Facsimile: (208) 938-8503
E-mail: luke@martellelaw.com

Attorney for Automotive Finance Corporation

UNITED STATES BANKRUPTCY COURT
DISTRICT OF IDAHO
BOISE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RYAN WILLIAM HAWKES and | ) | Case No. 19-00880-JDP |
| SUZANN MARGARET HAWKES, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| AUTOMOTIVE FINANCE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. |
| | ) | |
| RYAN WILLIAM HAWKES, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT TO DETERMINE DISCHARGEABILITY**
**OF DEBT PURSUANT TO 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6)**

Automotive Finance Corporation ("AFC"), by counsel and pursuant to 11 U.S.C. §§
523(a)(2), 523(a)(4) and 523(a)(6), and Rule 7001 of the Federal Rules of Bankruptcy Procedure,
for its Complaint against Ryan William Hawkes ("Hawkes"), states as follows:

**PARTIES**

ADVERSARY COMPLAINT - 1

1.    On July 31, 2019 (the "Petition Date"), Hawkes and Suzann Margaret Hawkes filed a joint petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Idaho. Suzann Margaret Hawkes is not a defendant herein.

2.    The deadline to file complaints to determine the dischargeability of debts in Hawkes' Chapter 7 case is October 28, 2019, which date has not yet passed.

3.    Hawkes is an individual and, upon information and belief, a resident of Idaho.

4.    AFC is an Indiana corporation, and a creditor of Hawkes.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

6.    Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1409.

7.    This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2).

8.    AFC consents to entry of final orders and judgment by the bankruptcy court in this adversary proceeding.

## FACTS APPLICABLE TO ALL COUNTS

9.    At all times relevant herein, Hawkes was the President of C.A.R.S. Enterprises, Inc. d/b/a Hawkes Motors ("Hawkes Motors"), an Idaho corporation.

10.    At all relevant times herein, Hawkes personally and actively participated in the management of Hawkes Motors, including the disposition of inventory and management of the dealership's financial affairs.

11.    On or about May 6, 2016, Hawkes, as President of Hawkes Motors, executed a Demand Promissory Note and Security Agreement (as amended or modified from time to time, the "Note"), pursuant to which Hawkes Motors promised to pay AFC $1,000,000.00, or such

ADVERSARY COMPLAINT - 2

greater or lesser principal amount as may be advanced by AFC pursuant thereto, together with interest. A true and accurate copy of the Note is attached as **Exhibit 1**.

12.     Under the terms of the Note and to secure Hawkes Motors' present and future obligations to AFC under that note and any other instrument, guaranty, or other document, Hawkes Motors granted AFC a security interest in substantially all of its assets, including inventory, then owned or thereafter acquired.

13.     Under the terms of the Note and to secure Hawkes Motors' present and future obligations to AFC under that note and any other instrument, guaranty, or other document, Hawkes Motors also granted AFC a purchase money security interest in all vehicles, parts, and equipment financed by AFC thereunder.

14.     On or about May 6, 2016, Hawkes executed an Unconditional and Continuing Guaranty pursuant to which he guaranteed the full and prompt payment of all obligations of Hawkes Motors to AFC under the Note and any other agreement, as amended, supplemented, or modified. A true and accurate copy of the Guaranty is attached to the Note as Exhibit C.

15.     AFC properly perfected its security interests in the assets of Hawkes Motors by making the appropriate UCC filings with the Idaho Secretary of State. A true and accurate copy of AFC's UCC filing is attached as **Exhibit 2**.

16.     Prior to the Petition Date, Hawkes Motors, through Hawkes, requested that AFC advance it money and/or extend it credit under the Note, and AFC in fact advanced money to Hawkes Motors and/or extended Hawkes Motors credit under the Note.

17.     Prior to the Petition Date, Hawkes Motors did not pay all amounts due and owing to AFC in accordance with the terms of the Note, and Hawkes Motors was and is in default thereunder.

ADVERSARY COMPLAINT - 3

18.     As of the Petition Date, Hawkes Motors owed AFC approximately $500,530.61 under the Note, not including attorneys' fees that have accrued and continue to accrue thereunder.

19.     Pursuant to the Note, AFC is entitled to attorneys' fees, costs, and expenses incurred collecting and enforcing the obligations under the Note, including the fees and expenses incurred in this proceeding.

20.     AFC has been required to hire attorneys to collect and enforce the obligations under the Note, and to commence and pursue this proceeding.

21.     AFC has incurred attorneys' fees, costs, and expenses collecting and enforcing the obligations under the Note, including the fees and expenses incurred in this proceeding.

22.     Hawkes is personally liable for the representations, acts, and omissions of material fact that he made or directed to be made to AFC that are set forth herein.

### COUNT I: Nondischargeability Under 11 U.S.C. § 523(a)(6) as a Result of the Sale of the Secured Vehicles Out of Trust

23.     AFC repeats and realleges paragraphs 1 through 22 above as if fully restated herein.

24.     Pursuant to the Note, Hawkes Motors represented to AFC that Hawkes Motors would hold funds derived from the sale of vehicles purchased by Hawkes Motors and financed by AFC under the Note in trust for the benefit of AFC (the "Trust Funds"), and that Hawkes Motors would pay the Trust Funds to AFC.

25.     Each time Hawkes Motors requested that AFC advance it money and/or extend it credit under the Note to finance the purchase of a vehicle, Hawkes Motors represented to AFC that Hawkes Motors would pay the Trust Funds derived from the sale of such vehicle to AFC.

26.     Based upon those representations, AFC advanced Hawkes Motors money and/or extended credit to Hawkes Motors under the Note to purchase vehicles for resale.

ADVERSARY COMPLAINT - 4

27.      Prior to the Petition Date, Hawkes Motors, through or at the direction of Hawkes,
directed the sale of certain vehicles purchased by Hawkes Motors and financed by AFC under the
Note (the "Secured Vehicles") but did not pay AFC the Trust Funds derived therefrom. A listing
of the Secured Vehicles is attached to as **Exhibit 3**.

28.      Section 28-9-311(a) of Revised Article 9 of the Uniform Commercial Code as
enacted in Idaho ("Revised Article 9") provides that, "Except as otherwise provided in subsection
(d) of this section, the filing of a financing statement is not necessary or effective to perfect a
security interest in property subject to: (b) Section 49-510, Idaho Code."

29.      Section 49-510 of the Idaho Code requires a security interest in a motor vehicle to
be noted on the certificate of title.

30.      Section 28-9-311(d) of Revised Article 9 is an exception to Section 49-510 of the
Idaho Code, and provides that, "During any period in which collateral subject to a statute specified
in subsection (a)(2) of this section is inventory held for sale or lease by a person or leased by that
person as lessor and that person is in the business of selling goods of that kind, this section does
not apply to a security interest in that collateral created by that person as debtor."

31.      The Secured Vehicles were inventory of Hawkes Motors within the meaning of
Section 28-9-102(a)(48) of Revised Article 9.

32.      AFC had a security interest in the Secured Vehicles.

33.      The Secured Vehicles were collateral of AFC.

34.      AFC properly perfected its security interest in the Secured Vehicles by filing a
financing statement with the Idaho Secretary of State in accordance with Sections 28-9-301(1) and
28-9-501(a)(2) of Revised Article 9.

35.      AFC's security interest in the Secured Vehicles was first priority.

ADVERSARY COMPLAINT - 5

36.     Hawkes Motors knew that AFC had a security interest in the Secured Vehicles.

37.     Hawkes knew that AFC had a security interest in the Secured Vehicles.

38.     Hawkes Motors knew that AFC had a properly perfected security interest in the Secured Vehicles.

39.     Hawkes knew that AFC had a properly perfected security interest in the Secured Vehicles.

40.     The Trust Funds were proceeds of the Secured Vehicles.

41.     AFC had a security interest in the Trust Funds.

42.     AFC's security interest in the Trust Funds was first priority.

43.     Hawkes Motors knew that AFC had a security interest in the Trust Funds.

44.     Hawkes knew that AFC had a security interest in the Trust Funds.

45.     AFC properly perfected its security interest in the Trust Funds.

46.     Hawkes Motors knew that AFC had a properly perfected security interest in the Trust Funds.

47.     Hawkes knew that AFC had a properly perfected security interest in the Trust Funds.

48.     Prior to the Petition Date, Hawkes Motors, through or at the direction of Hawkes, directed the sale of the Secured Vehicles and did not pay AFC the Trust Funds derived therefrom.

49.     Hawkes Motors knew that it was required to pay the Trust Funds to AFC.

50.     Hawkes knew that Hawkes Motors was required to pay the Trust Funds to AFC.

51.     Hawkes Motors knew that it did not have the authority or the consent of AFC to sell, transfer, or otherwise dispose of the Secured Vehicles and not pay AFC the Trust Funds.

ADVERSARY COMPLAINT - 6

52.    Hawkes knew that Hawkes Motors did not have the authority or the consent of AFC to sell, transfer, or otherwise dispose of the Secured Vehicles and not pay AFC the Trust Funds.

53.    Hawkes Motors had the ability to pay the Trust Funds to AFC.

54.    Hawkes Motors intentionally did not pay AFC the Trust Funds despite knowledge that injury to AFC was substantially certain to occur as a result.

55.    Hawkes intentionally did not pay AFC the Trust Funds despite knowledge that injury to AFC was substantially certain to occur as a result.

56.    Hawkes Motors knew that injury to AFC was substantially certain to occur as a result of Hawkes Motors' failure to pay AFC the Trust Funds.

57.    Hawkes knew that injury to AFC was substantially certain to occur as a result of Hawkes Motors' failure to pay AFC the Trust Funds.

58.    By not paying AFC the Trust Funds, Hawkes Motors knowingly forced AFC to take substantially less than what it was owed.

59.    By not paying AFC the Trust Funds, Hawkes knowingly forced AFC to take substantially less than what it was owed.

60.    Upon information and belief, Hawkes Motors used the Trust Funds for purposes other than paying AFC, including the payment of Hawkes Motors' other creditors.

61.    Upon information and belief, Hawkes used the Trust Funds for purposes other than paying AFC, including the payment of Hawkes' personal obligations.

62.    The sale by Hawkes Motors of the Secured Vehicles and the failure to pay AFC the Trust Funds, through or at the direction of Hawkes, was wrongful.

63.    The sale by Hawkes Motors of the Secured Vehicles and the failure to pay AFC the Trust Funds, through or at the direction of Hawkes, was done intentionally.

ADVERSARY COMPLAINT - 7

64.     The sale by Hawkes Motors of the Secured Vehicles and the failure to pay AFC the Trust Funds, through or at the direction of Hawkes, necessarily caused injury to AFC.

65.     The sale by Hawkes Motors of the Secured Vehicles and the failure to pay AFC the Trust Funds, through or at the direction of Hawkes, was done without just cause or excuse.

66.     AFC never recovered and was never paid for the Secured Vehicles.

67.     As of the Petition Date, the amount due and owing under the Note from Hawkes Motors and Hawkes to AFC with respect to the Secured Vehicles was $353,254.07.

68.     The debt, including attorneys' fees, costs, and expenses, arising from the willful and malicious injury to the Secured Vehicles, and AFC's interest therein, is a nondischargeable debt of Hawkes' pursuant to 11 U.S.C. § 523(a)(6).

69.     The debt, including attorneys' fees, costs, and expenses, arising from the willful and malicious injury to the Trust Funds and AFC's interest therein is a nondischargeable debt of Hawkes' pursuant to 11 U.S.C. § 523(a)(6).

WHEREFORE, AFC prays for: (a) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the willful and malicious injury to the Secured Vehicles is a nondischargeable debt of Hawkes' pursuant to 11 U.S.C. § 523(a)(6); (b) a determination that the debt, including attorneys' fees, costs, and expenses, arising willful and malicious injury to the Trust Funds and AFC's interest therein is a nondischargeable debt of Hawkes' pursuant to 11 U.S.C. § 523(a)(6); and (c) all other proper relief.

**COUNT II: Nondischargeability Under 11 U.S.C. § 523(a)(2)(A) as a Result of Property Fraudulently Obtained Related to the Lot Audit Fraud Vehicles, the Subsequently Sold Vehicles, the Subsequent Advance Vehicles, and the Fraudulently Floored Vehicles**

70.     AFC repeats and realleges paragraphs 1 through 69 above as if fully restated herein.

71.     AFC periodically conducts lots audits of its borrowers. One purpose of lot audits is to confirm that vehicles purchased by a borrower and financed by AFC and for which AFC has not yet been paid in full are unsold and constitute inventory of the borrower upon which AFC has properly perfected security interests.

72.     If AFC learns during an audit that collateral has been sold but sale proceeds have not been paid to AFC, or that AFC does not have a security interest in vehicles that it has financed under the Note, then AFC has the right under the Note to declare a default and exercise its legal rights including repossessing its collateral and/or refusing to make further advances to a borrower under its loan documents with AFC.

73.     On or about May 31, 2018, AFC, by or through its agent, conducted an audit of the lot of Hawkes Motors (the "May Lot Audit").

74.     On or about July 3, 2018, AFC, by or through its agent, conducted an audit of the lot of Hawkes Motors (the "July Lot Audit").

75.     During the May Lot Audit, AFC Stock No. 302, a 2015 Dodge Journey floored by AFC on January 31, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on April 19, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC. During the July Lot Audit, AFC Stock No. 302 was not on Hawkes Motors' lot. At that time, Hawkes represented to AFC because it was in the service shop but that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC,

ADVERSARY COMPLAINT - 9

he knew that the vehicle had been sold by Hawkes Motors on April 19, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

76.     During the May Lot Audit, AFC Stock No. 305, a 2014 Ford Fiesta floored by AFC on February 14, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 11, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC. During the July Lot Audit, AFC Stock No. 305 was again present on Hawkes Motors' lot and Hawkes again represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 11, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

77.     During the May Lot Audit, AFC Stock No. 329, a 2014 BMW 4-Series floored by AFC on March 14, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 12, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC. During the July Lot Audit, AFC Stock No. 329 was not on Hawkes Motors' lot. At that time, Hawkes represented to AFC because it was in the service shop but that

ADVERSARY COMPLAINT - 10

the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 12, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

78.     During the May Lot Audit, AFC Stock No. 336, a 2008 Dodge Ram 2500 floored by AFC on March 22, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on April 18, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC. During the July Lot Audit, AFC Stock No. 336 was again present on Hawkes Motors' lot and Hawkes again represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on April 18, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

79.     During the May Lot Audit, AFC Stock No. 338, a 2015 Ford F150 floored by AFC on April 13, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on April 28, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid

ADVERSARY COMPLAINT - 11

them to AFC. During the July Lot Audit, AFC Stock No. 338 was again present on Hawkes Motors' lot and Hawkes again represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on April 28, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

80.     During the May Lot Audit, AFC Stock No. 341, a 2013 Audi Q7 floored by AFC on April 25, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 17, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC. During the July Lot Audit, AFC Stock No. 341 was again present on Hawkes Motors' lot and Hawkes again represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on May 17, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

81.     During the July Lot Audit, AFC Stock No. 339, a 2008 Pontiac Grand Prix floored by AFC on April 24, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on June 29,

2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

82.     During the July Lot Audit, AFC Stock No. 348, a 2011 Chevrolet Tahoe floored by AFC on June 7, 2018 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold by Hawkes Motors on June 22, 2018 and that Hawkes Motors had already received the Trust Funds from the sale of that vehicle but had not paid them to AFC.

83.     AFC Stock Nos. 302, 305, 329, 336, 338, 339, 341, and 348 are referred to collectively herein as the "Lot Audit Fraud Vehicles." AFC did not recover and was never paid for those vehicles, and as of the Petition Date the amount due and owing from Hawkes Motors to AFC under the Note on the Lot Audit Fraud Vehicles was $122,024.90. A listing of the Lot Audit Fraud Vehicles is attached to as **Exhibit 4**.

84.     Hawkes Motors had already received the Trust Funds from the sale of each of the Lot Audit Fraud Vehicles at the time of the lot audits but had not paid them to AFC and did not pay them to AFC.

85.     As a result of the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above, AFC was unable to determine that Hawkes Motors had sold vehicles out of trust and that Hawkes Motors had not paid AFC the Trust Funds derived from the sale of those vehicles and that AFC had lost its security interest in those vehicles.

86.    As a result of the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above, AFC was unable to determine that Hawkes Motors was in default under the Note.

87.    Had AFC known the true status of the Lot Audit Fraud Vehicles that were misrepresented during and after the lot audits and the fact that they were no longer collateral securing AFC's loan to Hawkes Motors at the time of the Lot Audit, AFC would have exercised its legal rights in an effort to mitigate its damages by, among other things, immediately repossessing its remaining collateral. As a result of the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above, however, AFC did not exercise its rights under the Note and did not repossess its collateral immediately after the lot audits.

88.    Had AFC repossessed its collateral after the lot audits, it could have recovered AFC Stock Nos. 346, 348, 350, 351, 359, 360, 365, 366, 369, and 371 (the "Subsequently Sold Vehicles"). AFC did not recover and was never paid for those vehicles, and as of the Petition Date the amount due and owing from Hawkes Motors to AFC under the Note on the Subsequently Sold Vehicles was $246,034.24. A listing of the Subsequently Sold Vehicles is attached to as **Exhibit 5**.

89.    In addition to repossessing its collateral, had AFC known the true status of the Lot Audit Fraud Vehicles that were misrepresented during and after the lot audits and the fact that they were no longer collateral securing AFC's loan to Hawkes Motors at the time of the lot audits, AFC would have exercised its legal rights by refusing to make any further advances to Hawkes Motors. As a result of the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above, however, AFC did not know the true status of the Lot Audit Fraud

ADVERSARY COMPLAINT - 14

Vehicles, did not exercise its legal rights, and continued to make advances to Hawkes Motors at the request of Hawkes.

90.     After the lot audits, and at the request of Hawkes, AFC financed the purchase of AFC Stock Nos. 346, 348, 350, 351, 353, 354, 358, 359, 360, 365, 366, 369, and 371 (the "Subsequent Advance Vehicles") by Hawkes Motors under the Note. AFC did not recover and was never paid for those vehicles, and as of the Petition Date the amount due and owing from Hawkes Motors to AFC under the Note on the Subsequently Sold Vehicles was $310,918.45. A listing of the Subsequent Advance Vehicles is attached to as **Exhibit 6**.

91.     On or about June 8, 2018, Hawkes requested that AFC advance Hawkes Motors money and/or extend it credit under the Note to finance the purchase of a 2017 Dodge Ram 1500 and represented to AFC that Hawkes Motors owned the vehicle and would grant AFC a first-priority security interest in the vehicle. In reliance upon that representation, AFC in fact advanced Hawkes Motors money and/or extended it credit under the Note to finance the purchase the vehicle and floored it on Hawkes Motors' floorplan on June 8, 2018 as Stock No. 353. At the time Hawkes represented to AFC that Hawkes Motors would grant AFC a first-priority security interest in the vehicle, Hawkes knew that Hawkes Motors had already sold the vehicle on May 28, 2018 and did not own the vehicle and could not grant AFC a first-priority security interest in the vehicle. Although AFC advanced funds to Hawkes Motors at Hawkes' request to finance the purchase of this vehicle, AFC was unaware that it did not receive first-priority security interest in the vehicle. During the July Lot Audit, AFC Stock No. 353 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold on May 28, 2018 and

ADVERSARY COMPLAINT - 15

that AFC had never received a security interest in the vehicle. AFC was never paid for AFC Stock No. 353.

92.     On or about June 19, 2018, Hawkes requested that AFC advance Hawkes Motors money and/or extend it credit under the Note to finance the purchase of a 2014 Jeep Grand Cherokee and represented to AFC that Hawkes Motors owned the vehicle and would grant AFC a first-priority security interest in the vehicle. In reliance upon that representation, AFC in fact advanced Hawkes Motors money and/or extended it credit under the Note to finance the purchase the vehicle and floored it on Hawkes Motors' floorplan on June 19, 2018 as Stock No. 354. At the time Hawkes represented to AFC that Hawkes Motors would grant AFC a first-priority security interest in the vehicle, Hawkes knew that Hawkes Motors had already sold the vehicle on June 4, 2018 and did not own the vehicle and could not grant AFC a first-priority security interest in the vehicle. Although AFC advanced funds to Hawkes Motors at Hawkes' request to finance the purchase of this vehicle, AFC was unaware that it did not receive first-priority security interest in the vehicle. During the July Lot Audit, AFC Stock No. 354 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold on June 4, 2018 and that AFC had never received a security interest in the vehicle. AFC was never paid for AFC Stock No. 354.

93.     On or about June 20, 2018, Hawkes requested that AFC advance Hawkes Motors money and/or extend it credit under the Note to finance the purchase of a 2011 Jeep Liberty and represented to AFC that Hawkes Motors owned the vehicle and would grant AFC a first-priority security interest in the vehicle. In reliance upon that representation, AFC in fact advanced Hawkes

ADVERSARY COMPLAINT - 16

Motors money and/or extended it credit under the Note to finance the purchase the vehicle and floored it on Hawkes Motors' floorplan on June 20, 2018 as Stock No. 358. At the time Hawkes represented to AFC that Hawkes Motors would grant AFC a first-priority security interest in the vehicle, Hawkes knew that Hawkes Motors had already sold the vehicle on June 18, 2018 and did not own the vehicle and could not grant AFC a first-priority security interest in the vehicle. Although AFC advanced funds to Hawkes Motors at Hawkes' request to finance the purchase of this vehicle, AFC was unaware that it did not receive first-priority security interest in the vehicle. During the July Lot Audit, AFC Stock No. 358 was present on Hawkes Motors' lot. At that time, Hawkes represented to AFC that the vehicle remained unsold and constituted inventory of Hawkes Motors upon which AFC had a properly perfected security interest. In fact, at the time Hawkes made those representations to AFC, he knew that the vehicle had been sold on June 18, 2018 and that AFC had never received a security interest in the vehicle. AFC was never paid for AFC Stock No. 358.

94.     AFC Stock Nos. 353, 354, and 358 are referred to collectively herein as the "Fraudulently Floored Vehicles." AFC did not recover and was never paid for those vehicles, and as of the Petition Date the amount due and owing from Hawkes Motors to AFC under the Note on the Fraudulently Floored Vehicles was $64,884.21. A listing of the Fraudulently Floored Vehicles is attached to as **Exhibit 7**.

95.     Hawkes Motors obtained money, property, and/or an extension of credit from AFC by false pretenses, false representations, and/or actual fraud through the representations made to AFC by Hawkes that are set forth above.

96.     Hawkes knew the representations, statements, and/or omissions of material fact that were made by him to AFC that are set forth above were false at the time they were made.

ADVERSARY COMPLAINT - 17

97.    The representations, statements, and/or omissions of material fact that were made by Hawkes to AFC that are set forth above were made with the intention and purpose of deceiving AFC.

98.    AFC relied on the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above.

99.    AFC's reliance on the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above was reasonable and justified.

100.    As a proximate result of the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above, AFC sustained loss and has been damaged.

101.    By making or directing the representations, statements, and/or omissions of material fact to AFC that are set forth above, Hawkes induced AFC to forbear from exercising its legal rights, including its rights under the Note.

102.    By making or directing the representations, statements, and/or omissions of material fact to AFC that are set forth above, Hawkes induced AFC to not repossess its collateral.

103.    By making or directing the representations, statements, and/or omissions of material fact to AFC that are set forth above, Hawkes induced AFC to continue making advances to Hawkes Motors under the Note.

104.    AFC would not have sustained the damages that it did but for the representations, statements, and/or omissions of material fact made by Hawkes to AFC that are set forth above.

105.    The debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extension of credit Hawkes Motors obtained from AFC by false pretenses, false

representations, and/or actual fraud related to the Lot Audit Fraud Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A).

106.    The debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extension of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Subsequently Sold Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A).

107.    The debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extension of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Subsequent Advance Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A).

108.    The debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extension of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Fraudulently Floored Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A).

WHEREFORE, AFC prays for: (a) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extensions of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Lot Audit Fraud Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A); (b) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extensions of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Subsequently Sold Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A); (c) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or

ADVERSARY COMPLAINT - 19

extensions of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Subsequent Advance Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A); (d) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the money, property, and/or extensions of credit Hawkes Motors obtained from AFC by false pretenses, false representations, and/or actual fraud related to the Fraudulently Floored Vehicles is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(2)(A)and (e) all other proper relief.

### COUNT III: Nondischargeability Under 11 U.S.C. § 523(a)(4) as a Result of Defalcation of the Trust Funds

109.    AFC repeats and realleges paragraphs 1 through 108 above as if fully restated herein.

110.    By executing the Note, AFC and Hawkes Motors intended to create an express or technical trust with respect to the Trust Funds.

111.    Pursuant to the Note, Hawkes Motors and Hawkes were trustees and AFC was the beneficiary with respect to the Trust Funds.

112.    Hawkes Motors expressly agreed that it would hold the Trust Funds in trust for the benefit of AFC.

113.    Hawkes expressly agreed that Hawkes Motors would hold the Trust Funds in trust for the benefit of AFC.

114.    Hawkes Motors was clearly put on notice that it was undertaking the special responsibilities of a trustee with respect to the Trust Funds.

115.    Hawkes was clearly put on notice that he was undertaking the special responsibilities of a trustee with respect to the Trust Funds.

116.    There was a fiduciary relationship between Hawkes Motors and AFC with respect to the Trust Funds.

117.    There was a fiduciary relationship between Hawkes and AFC with respect to the Trust Funds.

118.    Hawkes Motors did not have unrestricted use of the Trust Funds.

119.    Hawkes Motors knew that it did not have unrestricted use of the Trust Funds.

120.    Hawkes did not have unrestricted use of the Trust Funds.

121.    Hawkes knew that he did not have unrestricted use of the Trust Funds.

122.    Hawkes Motors was not entitled to treat the Trust Funds as its own.

123.    Hawkes Motors knew that it was not entitled to treat the Trust Funds as its own.

124.    Hawkes was not entitled to treat the Trust Funds as his own.

125.    Hawkes knew that he was not entitled to treat the Trust Funds as his own.

126.    While acting in a fiduciary capacity, Hawkes Motors failed to properly account for the Trust Funds.

127.    Hawkes Motors' failure to properly account for the Trust Funds was improper.

128.    Hawkes Motors' failure to properly account for the Trust Funds was intentional.

129.    While acting in a fiduciary capacity, Hawkes failed to properly account for the Trust Funds.

130.    Hawkes' failure to properly account for the Trust Funds was improper.

131.    Hawkes' failure to properly account for the Trust Funds was intentional.

132.    As of the Petition Date, the value of the Trust Funds was $353,254.07.

ADVERSARY COMPLAINT - 21

133.    The debt, including attorneys' fees, costs, and expenses, arising from the failure to pay the Trust Funds to AFC is a result of defalcation while acting in a fiduciary capacity, and is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(4).

WHEREFORE, AFC prays for: (a) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the failure to pay the Trust Funds to AFC is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(4) as a result of defalcation; and (b) all other proper relief.

### COUNT IV: Nondischargeability Under 11 U.S.C. § 523(a)(4) as a Result of Embezzlement of the Trust Funds

134.    AFC repeats and realleges paragraphs 1 through 133 above as if fully restated herein.

135.    AFC was the beneficial owner of the Trust Funds.

136.    AFC permitted Hawkes Motors to retain the Trust Funds pursuant to the terms of the Note.

137.    Hawkes Motors did not have unrestricted use of the Trust Funds.

138.    Hawkes Motors was not entitled to treat the Trust Funds as its own.

139.    Hawkes did not have unrestricted use of the Trust Funds.

140.    Hawkes was not entitled to treat the Trust Funds as his own.

141.    While acting in a fiduciary capacity, Hawkes Motors misappropriated the Trust Funds.

142.    While acting in a fiduciary capacity, Hawkes misappropriated the Trust Funds.

143.    Upon information and belief, Hawkes Motors appropriated the Trust Funds for its own use or benefit.

ADVERSARY COMPLAINT - 22

144.    Upon information and belief, Hawkes appropriated the Trust Funds for his own use or benefit.

145.    Upon information and belief, Hawkes Motors appropriated the Trust Funds with fraudulent intent.

146.    Upon information and belief, Hawkes appropriated the Trust Funds with fraudulent intent.

147.    Upon information and belief, Hawkes Motors converted the Trust Funds.

148.    Upon information and belief, Hawkes converted the Trust Funds.

149.    As of the Petition Date, the value of the Trust Funds was $353,254.07.

150.    The debt, including attorneys' fees, costs, and expenses, arising from the failure to pay the Trust Funds to AFC is a result of embezzlement, and is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(4).

WHEREFORE, AFC prays for: (a) a determination that the debt, including attorneys' fees, costs, and expenses, arising from the failure to pay the Trust Funds to AFC is a nondischargeable debt of Hawkes pursuant to 11 U.S.C. § 523(a)(4) as a result of embezzlement; and (b) all other proper relief.

Respectfully submitted,

/s/ Luke R. Gordon
Luke R. Gordon
Law Offices of Martin Martelle PA
ISB No. 10681
5995 W. State Street, Suite A
Boise, Idaho 83703
Phone: (208) 938-8500
Fax: (208) 938-8503
Email: luke@martellelaw.com

*Attorney for Automotive Finance Corporation*

ADVERSARY COMPLAINT - 23